Filed 1/26/15  In re Patrick E. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re PATRICK E., a Person Coming Under the Juvenile Court Law. | B254725 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JULIE E.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK01697) |

        APPEAL from orders of the Superior Court of Los Angeles County.  Tony L. Richardson, Judge.  Affirmed.

        Jesse McGowan, under appointment by the Court of Appeal, for Appellant.

        Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kim Nemoy, Deputy County Counsel.

_____

Julie E. (mother) appeals from the order adjudicating her son, Patrick E., a person described by Welfare and Institutions Code section 300, subdivision (c), and from the dispositional order placing Patrick with paternal grandparents.[1] Mother contends the orders were not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2013, Patrick was 14 years old and he had not seen his married 19-year-old half-sister, Elizabeth, in almost four years. In October 2010, Elizabeth had been declared a dependent child based on physical and emotional abuse; Elizabeth never reunified with father and mother (Elizabeth's step-mother); paternal grandparents became her legal guardians and dependency jurisdiction was terminated in January 2012.

On October 6, Elizabeth tried to make arrangements to visit her estranged family. At about 11:00 p.m. after father did not respond to Elizabeth's calls and texts to set up a time, Elizabeth and her husband decided to just go to the house. As they arrived, they encountered Patrick leaving the house. Elizabeth, her husband and Patrick spent the next several hours sitting on a park bench while Patrick told Elizabeth about problems he was having at home, including an incident in March 2013 in which father broke Patrick's collar bone. Patrick stayed with Elizabeth that night, and she dropped him off at school the next morning, October 7. Patrick revealed the situation to school authorities that day; they referred the matter to the Department of Children and Family Services (DCFS).

Describing the March 2013 broken collar bone incident to the DCFS social worker who interviewed him at school that day, Patrick said: " 'Me and my dad got into a fight. I have a bad memory. I don't remember why. I was sleeping in my bed. He got me out of bed. He dragged me onto the floor and picked me off the ground and head butted me. There were a few punches. He did a wrestling move and he threw me straight to the ground on the floor. I broke my collar bone. I had no clue it was broken. My dad took

---

[1] All future undesignated statutory references are to the Welfare and Institutions Code.

2

me to the doctor. I don't remember why he did it but he must have had a reason. He didn't do it just cause he felt like it. I kept the story about the bike accident.' " During the altercation, mother stayed in her room with the door shut; she knew about Patrick's altercation with father but did nothing to protect Patrick and never asked what happened. The next day, Patrick told school officials that he was injured in a bicycle accident because he did not want father to go to jail. Patrick also told the social worker that mother calls him derogatory names, which makes him feel depressed and insecure. Patrick knew his parents used marijuana, but they did not use in his presence. Father had a license to grow marijuana, which he grew in the garage; Patrick had helped father carry marijuana growing equipment into the garage; father also sold marijuana, but Patrick did not know where. Too afraid to go home, Patrick was taken into protective custody by law enforcement and released to DCFS.

That same day, the social worker and a deputy sheriff interviewed father, who said he last saw Patrick at about 8:00 p.m. the night before (October 6); father did not know Patrick later left and was out all night. Father showed them to the locked garage where he grows the marijuana which he uses as a sleep aid (father had an expired medical marijuana card); Patrick had never been inside the garage. The equipment Patrick helped father move was still in father's van. Father denied breaking Patrick's shoulder and denied verbally abusing him. Father believed Patrick broke his shoulder in an incident in which Patrick stole another student's bicycle.[2] Father speculated that Patrick was fabricating the abuse allegations to avoid being punished for staying out all night and that his half-sister Elizabeth was "putting this bullshit into his mind."

During an interview later that same day, mother characterized Elizabeth as a "chronic liar" and a bad influence on Patrick. Mother recalled that Elizabeth knocked on the door late the night before (October 6), but mother and father ignored it; when Patrick was not in his room the next morning, mother assumed he had gone to school; mother was unaware Patrick had been out all night. Mother admitted using marijuana as a "stress

---

[2] Patrick's school counselor told the social worker that there was no record of any stolen bicycle incident involving Patrick.

reliever;" Patrick never saw mother or father under the influence and they never offered Patrick marijuana; mother thought Patrick might be using drugs he obtained from his friends. Mother believed Patrick broke his shoulder in the stolen bicycle incident. Mother denied verbally abusing Patrick.

Following a detention hearing on October 10, 2013, the juvenile court ordered Patrick detained and released to DCFS. Patrick was placed in a group home. Later, he was placed with paternal grandparents. A few days later, mother told the social worker she was unsure whether Patrick should return home. Mother did not have confidence that family reunification services or family counseling would be helpful unless Patrick and father "truly believed in it."

During a forensic interview at Harbor UCLA Child Crisis Center on November 6, 2013, Patrick gave a consistent account of the abuse he suffered at home, and reiterated that he did not want to live with mother and father. Patrick reported suffering five concussions (three at school and two about which he could not recall any details). He recalled mother hitting him with a closed fist when he was about eight; according to Patrick, this allegation was previously investigated by DCFS. Patrick often spent the night at friends' homes and his parents were sometimes unaware that he was not at home. Regarding the March 2013 incident, Patrick said father dragged him out of bed, slammed him on the floor, body slammed him and head butted him. Patrick was sure the body slam was what caused his broken collar bone. He told the school nurse and the doctor that he was injured in a bicycle accident to protect father. Patrick said father usually used grounding as a form of discipline, but would get physical for more serious infractions. Throughout the interview, Patrick had a "flat affect." The evaluator found it noteworthy that Patrick did not embellish his story. The evaluator's report concludes: "Given Patrick's consistent report of physical abuse, the evaluator recommended that DCFS ensure that Patrick participate in mental health counseling with a therapist qualified to work with adolescents who have reported physical abuse."

For the most part, the jurisdiction report repeated information set forth in the detention report. Mother told the social worker that she was not sure if she wanted

4

reunification services; mother believed Patrick should live with maternal grandfather in Arizona, or attend military school. Father wanted Patrick returned home; he was willing to participate in counseling but did not believe it would help since it was ineffective with Elizabeth. On November 13, 2013, the jurisdiction hearing was continued to February 2014.

According to an Interim Review Report filed a few weeks before the hearing, Patrick had recanted much of what he previously told social workers and the forensic evaluator: he no longer knew how his collar bone came to be broken, he was not afraid of mother and father, and he wanted to go home. Patrick explained that he had been under the misimpression that he and Elizabeth would be able to live together in an apartment and he would not have "all these tiny rules." Paternal grandfather thought Patrick ran away because he was mad at his parents, and may have "stretched the truth." Paternal grandmother thought Elizabeth "may have elaborated." Both paternal grandparents believed Patrick could safely return home.

Mother, father and Patrick were the only witnesses at the adjudication and disposition hearing on February 3 and 4, 2014. Father testified that one day in March 2013, he was at work when he received a text message from mother informing him that Patrick had stolen a bicycle. Upon arriving home that night, he went directly into Patrick's bedroom with the intention of "getting to the bottom" of the matter. Patrick pretended to be asleep. Father told Patrick two or three times to get out of bed. Father raised his voice, but he was not screaming. Patrick said he did not want to get out of bed and suggested that they discuss it the next morning. Dissatisfied with this response, father grabbed Patrick by the foot and ankle and yanked him out of bed onto the floor, where Patrick landed on his butt. Father believed this was an appropriate way to deal with the situation. Patrick stood up on his own and walked with father into the hallway. Father did not recall physically touching Patrick in any other way that evening; he did not head butt Patrick, body slam him, shove him into the hallway or grab him by the arm. Even though Patrick was not wearing a shirt, father was so focused on discussing the bicycle theft that he did not notice Patrick's injuries until mother pointed them out. The

5

bruising and scraping on Patrick's shoulder and elbow were not unusual for a bicycle accident. Although Patrick stayed home from school the next day, he did not appear to require medical attention because he was able to move his arm. It was not until father took Patrick to the doctor the following day (two days after pulling him out of bed), that father saw that Patrick's "collar bone was sticking out of the skin." The bone had not been sticking out of the skin when father saw it the day before. Father did not believe Patrick hit his shoulder when father pulled him out of bed; but even if he did, the impact was "way too light" to have been the cause of Patrick's broken collar bone.

Mother testified that when she came home from work one day in March 2013, she saw that Patrick was "all beat up" with "abrasions like pretty much all the way down his whole body. It was whatever. He said he broke his collar bone. It was like all over from head to toe like road rash." Patrick said he was injured in a bicycle accident and did not need medical attention. Later that evening, a schoolmate of Patrick's and that boy's mother came to the house and said that after an altercation, Patrick stole the boy's bicycle and backpack. Mother texted father about the accusation, but not about Patrick's injuries. Patrick later explained to mother that he took the bicycle and backpack because the boy had a weapon in the backpack, which Patrick was afraid the boy would use against him. Mother confirmed there was such an item in the backpack. Patrick returned the bicycle to the boy and the matter was thus resolved "between the families." Mother and Patrick went to sleep. Unaware that the matter had been resolved, father came home that night and went immediately into Patrick's bedroom. Hearing raised voices and a "thump," mother went into Patrick's room where she saw father holding Patrick's injured arm. As soon as mother told him that Patrick was injured, father let go. Father told Patrick to go back to bed and they would discuss it the next day. Later, mother learned that the "thump" she heard was Patrick being pulled out of bed by father. Patrick stayed out of school the next day, but went back to school the day after that. Father picked up Patrick from school in response to a call from the school reporting that Patrick was injured. Mother did not believe father broke Patrick's collar bone. Rather, she believed Patrick's collar bone was weakened in the bicycle incident and he broke it at school two days later,

6

by putting a heavy back pack on his injured shoulder. Mother disciplined Patrick by yelling at him. She had tried taking things away as punishment, but it did not seem to work. Mother did not believe family counseling would relieve the conflicts and tensions in the home. Mother uses marijuana to relive stress and in "social situations," but never in front of Patrick. Mother occasionally drinks to excess at a party, but only if she is with someone she can trust to take her home and never in front of Patrick.

Patrick testified that he and Elizabeth devised a plan whereby she would get legal guardianship of Patrick, but that did not work out and now, having learned his lesson, he wanted to go home. The allegations of the petition were things Elizabeth said, not him. Patrick denied any physical abuse by either parent, he was not afraid of either parent and he did not recall telling the social worker otherwise. Asked what he told the social worker, Patrick said, "I was very optimistic because, you know, I've been – it was very – it was an optimistic moment. I don't know if I am afraid of them, and I don't know if I want to return home yet. So, no." Regarding his broken collar bone, Patrick testified that, after falling off a bicycle he stole from a friend, he had some scrapes on his left shin and a swollen left shoulder. Patrick told mother he had been in another bicycle accident (Patrick did bicycle tricks and had fallen "too many times to count"). Although mother asked, Patrick said he did not need medical attention. Later that night, Patrick was asleep when father entered his room, yelling. Father pulled Patrick out of bed by the left shoulder. Patrick did not recall how he got up, but somehow he ended up in the hallway with father holding onto Patrick's injured arm and yelling at him. Father did not hit Patrick, head butt him or body slam him; Patrick did not recall telling the UCLA interviewer otherwise. Patrick believed he broke his collar bone at school the next day, by putting a heavy backpack on his injured shoulder. Mother usually disciplined Patrick by yelling at him; Patrick could not recall mother ever hitting him, even when he was younger. Father has called Patrick a "dumb-ass" on several occasions, but it does not bother Patrick. Father occasionally drinks beer which sometimes makes him more verbally aggressive. Patrick was not aware that either of his parents smoked marijuana and did not recall telling a social worker otherwise.

7

The juvenile court sustained the section 300 petition, finding Patrick a dependent child under subdivisions (a), (b) and (c) of that section. Jurisdiction was based on (1) father's physical abuse occurring when he dragged Patrick out of bed and threw him to the ground and mother's failure to protect Patrick from such abuse (paragraphs a-1, b-1) and (2) parents' excessive use of profanity when speaking to Patrick, and speaking to Patrick in a derogatory and demeaning manner, which had caused Patrick to "become depressed, withdrawn and emotionally fragile . . . . Such ongoing emotional abuse of [Patrick] by the parents places [Patrick] at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal and untoward aggressive behavior towards self and others." (Paragraph c-1.) The juvenile court placed Patrick with paternal grandparents, finding by clear and convincing evidence that return to parents' custody presented a substantial danger to Patrick's physical and/or emotional well-being. Mother and father were given thrice weekly monitored visits.

Mother timely appealed. Father did not appeal.

## DISCUSSION

A. *Substantial Evidence Supports Jurisdiction Under Section 300*

Mother contends insufficient evidence supports the juvenile court's finding that Patrick was a person described by section 300, subdivision (c) ["The child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian . . . ."]. Although she expressly does not challenge the jurisdictional findings under section 300, subdivisions (a) and (b), mother argues her challenge to the subdivision (c) findings is not moot because the finding was also the basis of the dispositional order removing Patrick from her custody. We disagree.

The juvenile court's finding that a child is a person described by section 300 must be supported by a preponderance of the evidence. (§ 355; *In re John M.* (2013)

8

217 Cal.App.4th 410, 418.) On appeal, we review those findings for substantial evidence, which is relevant evidence that " 'adequately supports a conclusion; it is evidence which is reasonable in nature, credible and of solid value.' [Citation.]" (*In re Francisco D.* (2014) 230 Cal.App.4th 73, 80.) When a dependency petition alleges multiple grounds for dependency jurisdiction, a reviewing court can affirm the jurisdictional finding if any statutory basis is supported by substantial evidence. (*In re Francisco D.,* at p. 80; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492.)

Here, the unchallenged jurisdictional findings based on section 300, subdivisions (a) [serious physical harm or risk of serious physical harm inflicted non-accidentally] and (b) [failure to protect from serious physical harm or risk of harm], make it unnecessary for us to determine whether jurisdiction is also supported under subdivision (c) of section 300.

B.      *Substantial Evidence Supports the Dispositional Order*

Mother contends there is insufficient evidence to support the order removing Patrick from parental custody and placing him with paternal grandparents. She argues: "Patrick was in no serious physical danger given his age and the lack of any ongoing physical abuse. Nor would Patrick have suffered serious emotional damage if allowed to return home. Commonplace friction between a teenage minor and his parents is not the type of evidence that can support a removal order." We find no error.

Custody of a dependent child may not be taken from his or her custodial parent "unless the juvenile court finds clear and convincing evidence . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home . . . ." (§ 361, subd. (c)(1).) We review the juvenile court's dispositional finding for substantial evidence. (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.) Substantial evidence is relevant evidence that " 'adequately supports a conclusion; it is evidence which is reasonable in nature, credible and of solid value.' [Citation.]" (*Francisco D, supra,* 230 Cal.App.4th at p. 80.) Among the factors that may be considered is evidence that a

9

parent is in denial about the problem that brought the child into the dependency system. (See *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.)

Here, the problem that brought Patrick into the dependency system was father's physical abuse of Patrick in March 2013 when, according to the sustained petition, father "drag[ged] the child to the floor. The father threw the child to the ground, possibly inflicting or at least exacerbating an injury to the child's collar bone. Such physical abuse was excessive and caused the child unreasonable pain and suffering. [Mother] failed to protect the child when she knew that the child was being physically abused by the father." At the February 2014 hearing, father testified as follows: "[FATHER]: After two or three attempts asking him to get out of bed and his refusal, I grabbed him from his foot and pulled him from the bed to get this resolved. [¶] [PATRICK'S COUNSEL]: Do you think that was an appropriate way to deal with him? [¶] [FATHER]: Yes." Father's testimony that he believed the physical abuse he inflicted on Patrick in March 2013 was appropriate, is substantial evidence that such abuse was likely to reoccur and, concomitantly, that return of Patrick to parents presented a substantial danger to Patrick's physical well-being.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.


                                        RUBIN, ACTING P. J.
WE CONCUR:



          FLIER, J.



          GRIMES, J.


10